Bissell, J.,
delivered the opinion of the court.
A corporation commonly known as the C. C. & I. Co., who are the appellants, were the operators of a coal mine at Berwind, in Colorado, in the summer of 1892. On the 11th of July, two men were killed in the main entry of the mine, about four hundred feet from its mouth; and Anna Carpita, the widow of one, brought this action to recover damages for the death of her husband. The case does not abound in data which enable us to give a thoroughly exact description of the property, but enough, probably, to make the situation and the circumstances plain. The accident happened in the main *249 entry, about four hundred feet from its mouth. Whether this entry was the continuation of an incline running to the surface, or reached by a shaft sunk from the surface, does not appear. The seam of coal was of an average thickness of five feet, and was covered at the top by a layer of bone coal, and its boundary is somewhat variously described by the witnesses. Some called it a soapstone, which is technically known as “ steatite,” being a granular description of talc, closely resembling stone, which scales and disintegrates on exposure to the air. Other witnesses, apparently of somewhat larger experience, call it slate, which is an indurated clay, forming one of the alternating beds of the coal measures. Whether it be the one or the other, its common characteristics are very much the same. It is of a clay structure, hardened under pressure until it closely resembles rock. The witnesses agree that this material is much seamed and fractured, and, on the removal of the coal, moves and separates in a way which the miners term “ slip.” The bone coal is of a varying thickness, from a few inches to two or three feet, and hides the fractures or seams in the overlying roof. Sometimes these slips run parallel with the entry, when they are quite dangerous, and result in rock falls. Slips at right angles to the entry are seldom so dangerous, for the ends rest on what are termed the “ ribs ” or “ pillars,” consisting of the unmined coal which forms the boundaries of the entries. On the left of the main entry, as it is entered at distances varying from thirty to fifty feet, rooms were run by the miners for the extraction of coal. There were some twenty odd rooms between the mouth of the main entry and a cross entry, which was some little distance beyond the room in which Carpita and his partner, Franza, were at work. Parallel to this main entry a back entry had been run from near the mouth, about thirteen hundred feet, to the cross entry. The rib or pillar which had been left standing between these two entries was from thirty to sixty feet thick. One of the main purposes of this entry was the ventilation of the mine, although it could be used, at the pleasure of the *250 miner, as a traveling way, instead of the main entry, which was commonly used for that purpose.
The main entry was generally timbered throughout its course. The extent and the character of the timbering was varied by the nature of the roof, regard being had both to its structure and solidity. There is much controversy between the witnesses as to the timbering which had been done between rooms four and five, which was the point of the accident. We need not settle the controversy, for the case will turn upon a legal proposition unaffected by this conflict. When a fall occurs in this formation, it sometimes takes a shape which the miners term a “ pot hole,” being a fracture usually square on two sides, and running at an angle up to a point in the roof, so that the rock is of conical shape when it drops. The original fall described by the witnesses was of this form. Some time in the afternoon a large break bccurred in the roof, about four hundred feet from the main entry, and some six or eight tons of rock fell. It broke some of the timbers which were under iV and left a large section of the roof exposed. It was some two or three feet wide, and probably about eight or ten long. This fall hurt nobody. As soon as it happened the mining boss and some of the laborers proceeded to remove the rock and clear the way for the passage of the cars which carried the coal broken by the miners in the various rooms. The roof was examined and tapped by the boss, to determine its solidity, and, with the workmen which he called to his assistance, he proceeded to place a prop or stull, topped by a cap or crossbar, under the rock, to hold it while they were preparing and putting in such timbers as in their judgment might be necessary to securely hold the breaking roof. The regular timbering is described by the workmen as consisting of lags and crossbars, which seem to be what other miners usually call posts and caps, as they are used in the drifts and levels of metal producing mines. After this fall, the cars necessarily stopped, and the miners were compelled to suspend work. After this work had been begun, Carpita and his partner, Franza, passed *251 out through the main entry to the surface. They came back shortly and went to their room, where they remained but a short time, when they again started to the surface. On arriving at the place of the fall, Franza passed on, while Carpita stopped, leaned up against the post or prop, and commenced talking with Lamb. Carpita could not have remained long before the accident. Franza had passed along a distance of less than fifty feet when there was a second squeeze or slide, which pressed the prop from under the overhanging rock, and a mass of it fell and killed Carpita and Lamb where they stood.
The Carpita and the Lamb cases were argued together, and while differing in some of their legal features, are dependent upon the same general facts for their history. This statement is substantially full enough to cover both cases.
It is an indisputable proposition, that no cause of action arises where the decedent has been guilty of a negligence which contributed to the injury complained of. The doctrine of contributory negligence is well established in this state, and the cases on this subject are numerous and uniform. Atchison, Topeka & S. F. R. R. Co. v. Farrow, 6 Colo. 498; Wells et al. v. Coe, 9 Colo. 159; Kennedy v. Denver, So. Park & Pac. Ry. Co., 10 Colo. 493 ; Denver, So. Park & Pac. Ry. Co. v. Wilson et ux., 12 Colo. 20; Lord v. Pueblo S. & R. Co., 12 Colo. 390; Jackson v. Crilly, 16 Colo. 103; Colo. Midland Ry. Co. v. O'Brien, 16 Colo. 219; Moffat v. Tenney, 17 Colo. 189.
The evidence demonstrates beyond peradventure that Car-pita voluntarily and without occasion assumed the risk which caused his death. He had no business at the point where the accident happened. He was á miner employed in a room many hundreds of feet away from the point of the accident, and his labors only took him to the room in which he was employed. His right to leave his room and go to the surface may be conceded, but the concession will not aid the plaintiff. Had he gone to the surface, and remained there, he would not have been hurt. He had no right to linger in a place of *252 danger when he was not compelled to do it by the performance of required labor. Conscious, as he must have been, of the danger lurking in the falling rock, he was bound, in the exercise of ordinary prudence, to go to the surface. Miners, who work under ground, should be conscious, and probably are conscious, of the perils of the mine, as those who go down into the sea are conscious of the perils of the deep. This knowledge imposes the duty of greater care. A still stronger reason is found in the circumstance that Carpita was not compelled to go under the place which the recent fall had demonstrated to be dangerous. There was another entry through which he might have gone to the surface. A miner will not be permitted to take a dangerous way when a safe one is provided for him, and, if he be hurt, charge the company with a responsibility for the injury which ensues from his own imprudence. As soon as it was demonstrated that Carpita voluntarily went into a place of danger, the right of action was destroyed. It made no difference whether this testimony came from the plaintiff’s witnesses or the defendant’s. When there was no conflict, there was nothing left for the jury to determine.
A very considerable argument is built upon the section of the mining statute which gives a right of action to the widow and lineal heirs in case of a breach of some of .the statutory requirements, or of any failure to observe any of those things which the statute prescribes. The suit was brought in the name of Carpita’s widow. The evidence showed there were several children, and it is insisted that since the right of action is given to the widow and lineal heirs, they must be joined in the suit. What the rule would be in a case unmistakably founded on a violation of the statute we do not undertake to determine. The statute gives a right of action for a violation of what it prescribes, but this fact does not destroy the right to sue for the injury occasioned by the death of the decedent under the other damage acts which are on the statute books. We do not intend to decide whether it would be possible to join a cause of action under the general dam *253 age act with one founded on a violation of the coal mining act. There are cases which intimate the plaintiff may recover on proof of facts which establish a cause of action at the common law, even though the complaint contain averments which are only material and relevant in an aotion brought for a violation of a statute of this description. This case comes very closely within that line of decisions, and the allegations which tend to show a violation of the mining act can be rejected as immaterial, and enough will be left to warrant the introduction of proof tending to show negligence on the part of the company, and the right of the plaintiff to maintain her suit. If it is ever proper to join the two causes of action, they should be separately stated, and each should contain enough to show a cause of action on the theory which may be adopted. The necessity to refer to the pleading springs from the circumstance that the trial court failed to observe this distinction in its instructions to the jury. Some of them were apt statements of the law controlling the case when it is viewed as an accident under the general damage act, which requires proof of the company’s negligence as contradistinguished from proof of a specific violation of some provision of the mining statute. The plaintiff made no attempt to prove a disregard of the' provisions of the coal mining act, but rested the case on the evidence which tended to show the company’s negligence in maintaining a safe place for its workmen, and in- repairing it when it was found to be insecure. The jury may have been misled by the court’s suggestion in this particular, and when they were told th*e company was required by the law to employ a competent mine boss, and they concluded his acts with respect to the maintenance of the roof and its repair after the rock had fallen were unskillful and negligent, they were compelled to find for the plaintiff, regardless of the general question of negligence or want of skill. The plaintiff did not attempt to show the boss to be incompetent or unskillful, or lacking in experience, and in no manner brought the case within what the act requires in respect to this matter. This sug *254 gestión will be sufficient to guide the court in the subsequent trial of the case. Where the case is one plainly within the terms of the act, and the real basis of the action is the alleged violation of its provisions, possibly the act alone must be looked to to ascertain the remedy, and to determine the parties who may sue. The present action is not within that class. Ryalls v. Mechanics' Mills, 150 Mass. 190.
While it may not influence the ultimate determination of the suit, one of the matters complained of by the appellant requires attention. After the commencement of the trial, and through the examination of one of the witnesses for the plaintiff, it transpired that the widow of the deceased was living in Italy, and had never been in this country. The action was begun about eleven days after Carpita was killed. This would appear to demonstrate the impossibility to procure authority from the widow to bring the action before it was actually commenced. The defendant asked leave to call on the plaintiff’s attorney to show his authority, which was denied. What may have been done respecting this matter since, we do not know. Where the right of the attorney to appear is questioned, not capriciously, but upon evidently good grounds, it is the duty of the court to require the attorney to exhibit his authority. The court did not proceed according to this well established, rule, and while it is possible the suit may now be prosecuted regularly, we think the court erred in denying the defendant’s application. Whether anything farther should be done in the matter, we are unable to determine, and the course to be taken must be settled by the nisi prius court.
For the errors discussed and resolved against the plaintiff, the judgment must be reversed, and the case remanded for a new trial.

Reversed.